THE OHIO BELL TELEPHONE CO., APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

(No. 39432—Decided April 6, 1966.)

*Mr. Dean G. Ostrum* and *Mr. Charles B. Ballou,* for appellant.

50

*Mr. William B. Saxbe,* attorney general, *Mr. Theodore K. High* and *Mr. Clark G. Redick,* for appellee Public Utilities Commission.

*Messrs. Laylin, McConnaughey & Stradley,* for appellee The Western Reserve Telephone Company.

*Mr. James E. Davis,* for appellee-subscribers.

SCHNEIDER, J. On December 29, 1964, the Public Utilities Commission ordered The Ohio Bell Telephone Company and The Western Reserve Telephone Company to inaugurate, within one year therefrom, toll-free extended-area telephone service between the Northfield exchange of Western Reserve and the 17 Cleveland metropolitan area exchanges of Ohio Bell in place of the existing message toll service.

The proceeding before the commission was instituted under Section 4905.26, Revised Code, upon complaint of 103 telephone subscribers of Western Reserve's Northfield exchange. In substance, they allege that message toll service is inadequate to meet the needs and convenience of the Northfield area, and that the day-to-day calling requirements of subscribers in the affected exchange areas (Northfield and Cleveland metropolitan) demand toll-free service between them.

The complaint alleges further "that the growth and development of the communities in the Northfield exchange area are rapid and continuing, that the communities border on the Cleveland metropolitan area exchange where growth and development are also rapid and continuing, that the communities are oriented to the Cleveland metropolitan exchange area for employment, business and professional services, shopping and social activities, and that such orientation is evidenced by a heavy volume of message toll telephone traffic between the two exchange areas, and by the wide distribution of calls from subscribers generally within the Northfield exchange * * * [and] that more than eighty per cent (80%) of the * * * [telephone customers of] Northfield exchange area signified their assent to" increased rates required by the proposed service.

Western Reserve, by answer, offered to furnish its part of the requested two-way extended-area service, provided Ohio Bell supplies its portion of that service. Ohio Bell, on the contrary, denied all the allegations of the complaint.

At the hearing, Ohio Bell conceded that toll service *from* Northfield *to* its Cleveland metropolitan area is inadequate, but it insists that *its* subscribers (in the Cleveland metropolitan area) do not need, desire or would be willing to pay an additional rate for toll-free service to Northfield. Alternatively, it proposed and agreed to provide its share of the facilities for one-way toll-free service from Northfield to Cleveland. The complainants and Western Reserve abjure this offer.

First and foremost of the three issues presented by this appeal is whether the order of the commission is unreasonable and unlawful in finding that message toll service from the Cleveland metropolitan area to Northfield is inadequate.

Numerous witnesses testified at the hearing before the commission and a profusion of exhibits were introduced. It appears that the Northfield exchange area typifies the small community located on the periphery of every large metropolitan area. Although politically in Summit County, it is geographically wedged between the Cuyahoga County municipalities of Brecksville on the west and Bedford on the north and is in large part contained within an arc of a circle whose center is located in downtown Cleveland and which extends to Ohio Bell's Trinity exchange on the west to the Willoughby and Gates Mills exchange areas on the east. It appears further that the usable land of the Northfield area is developed only to the extent of approximately 12½ per cent and that the complainants' averments as to the growth and future development of the area are substantially true. There was abundant testimony of necessary toll messages to and from each of the two exchange areas involving economic, educational, medical, governmental, religious and purely social matters.

For the purpose of testing the reasonableness and lawfulness of the commission's findings, it may be accepted that Ohio Bell's subscribers in the Cleveland metropolitan area number 563,000; that the number of toll messages per month from the main stations of those subscribers to main stations in the Northfield exchange is approximately 46,166, producing a calling index of 0.082 (the rate of calls per month per subscriber, determined by 46,166 ÷ 563,000); and that 42,000 calls originate from the main stations of 4,000 subscribers in the Northfield exchange

52

directed to the Cleveland metropolitan area exchanges, producing a calling index of 10.5. There is evidence that the messages to Cleveland are widely distributed throughout Ohio Bell's various exchanges and central offices in that area, but that a preponderance of the calling is to the central Cleveland exchanges. On the other hand, there is no evidence, probably from the lack of facilities to make such determination, of the distribution of these calls among Ohio Bell's Cleveland subscribers.

Against the weight of this evidence, Ohio Bell contends that there is no evidence upon which the commission could base its finding of need on the part of Cleveland subscribers for toll-free message service to Northfield, *i. e.*, that the present toll service from Cleveland to Northfield is adequate for the needs of the Cleveland subscribers. However, the number of calls from Cleveland, the character of those calls and the calling index among the Cleveland subscribers are sufficient to support the commission's order.

In *Ohio Central Telephone Corp.* v. *Pub. Util. Comm.*, 166 Ohio St. 180, this court so held on a record similar to, but less compelling than, the instant one. There, the calling index in the smaller area was 3.5 compared to 10.5 here. More significantly, the calling index in the larger area was 0.062, compared to 0.082 in this case. In other words, the mythical average Wooster subscriber in that case had occasion to call a party in the Congress exchange approximately once in every 16-month period, whereas the mythical average Cleveland subscriber in this instance has occasion to call Northfield by toll about once a year.[1]

---

[1]Substantially smaller exchanges were involved in that case, but the parallel is considerable, although at first blush, not apparent. Cleveland has 141 times more subscribers than Northfield, whereas Wooster's subscribers outnumbered those in Congress but 48.5 times. Assume, however, a Cleveland area of only 194,000 subscribers (48.5 x 4,000 subscribers in Northfield). If, on the basis of that hypothesis, the number of calls from Cleveland are reduced by the same percentage, the calling index of 0.082 remains constant. The probabilities are that the calling index would be even greater. Nevertheless, carrying the hypothesis to its extreme, and the number of calls from Northfield are reduced in the same proportion, that is, from 42,000 to 14,473 (194,000 ÷ 563,000 x 42,000), the hypothetical calling index

Ohio Bell contends, however, that because no Cleveland subscriber appeared to indicate a desire for the proposed service, or to object thereto, a finding that Cleveland subscribers (1) need and desire the new service and (2) "would [not] object to a possible infinitesimal increase in costs for * * * [that] service" is unreasonable. Considering the first branch of the objection, we doubt the feasibility of a representative number of Cleveland subscribers bearing witness to the Public Utilities Commission as to their desire for increased service. Even if this were physically possible, it might still be arguable that all subscribers not present as witnesses must be assumed to be objectors to the service.

The second branch of the objection leads us to the matter of costs and increased rates, which were not present in the record in *Ohio Central*. Invariably overlooked is that cost, except for the most basic necessities, is the most persuasive element in every decision to supply a presumed need. If the cost is excessive, the need remains unfulfilled. This is implicit in the requirement to furnish necessary and adequate service and just and reasonable facilities imposed upon telephone companies by Section 4905.22, Revised Code, because that section provides further that "all charges made or demanded for any [necessary] service rendered or to be rendered, shall be just [and] reasonable * * *."

In contrast to the situation in *Ohio Central*, the average cost of 1.8 cents per month per Ohio Bell subscriber for the proposed increased service is a fact in this record upon which the commission could find a need proportionate to, and reasonably suppliable at, that cost. In other words, the mythical average Cleveland subscriber's requirement to make one call per year to Northfield would be served at a cost of 22 cents compared to 25 cents (the present toll for a three-minute station-to-station call from Cleveland to Northfield).

---

to Cleveland would reduce to 3.6 (14,473 ÷ 4,000), still exceeding the Wooster index by 0.1. That result is unimportant in this case because the need for extended area service in the latter direction is conceded.

The foregoing illustrates that the size of the larger exchange area in relation to the smaller area affects not the calling index from the larger to the smaller but the calling index from the smaller to the larger.

54

The analysis suggested by Chief Justice Taft in his concurring opinion in *Ohio Central*, when applied here, demonstrates that each Cleveland metropolitan area subscriber will be "better off" under the new service by 0.7 per cent because he will be able to contact approximately 4,000 additional parties without a toll charge.[2]  Although the existing Cleveland rates are not a part of the record, we must conclude that an average increase of 1.8 cents per month is far less than 0.7 per cent of the average monthly bill.[3]  Ohio Bell advances no claim that the increased cost is disproportionate to the advantage its subscribers will derive from the increased service.[4] Nevertheless, the cost, along with the calling rates and volumes, is an integral part of the commission's finding of inadequate service to be rectified and of a need to be supplied to the Cleveland subscriber.  If all

[2]The Taft analysis may have even more relevance to the instant case. Northfield is one of many areas to which Clevelanders, particularly younger people, will, in increasing numbers, turn for living and breathing space, acquiring in the process economic and social ties to both areas which should not be impaired by the dead cost of toll telephone service.  Northfield is not only one of the growing "bedroom" communities of greater Cleveland but it is also part of the growing market for Cleveland's consumer goods and services.  Conversely, Cleveland remains ever increasingly the market for the labor force of Northfield.

[3]Assuming solely for the purposes of this analysis that the lowest basic rate for Cleveland, which is not in the record, is equal to the lowest basic residence rate in Northfield of $4.30 (which is in the record), 0.7 per cent of that rate would amount to an increase slightly in excess of 3 cents per month, or 1.2 cents in excess of the proposed increased rate (3 - 1.8).

Another approach is that 1.8 cents equals a 0.7 per cent increase of a basic rate of $2.46.  We can safely notice that the Cleveland basic monthly telephone rate is not so low as that.

[4]As in *Ohio Central*, Ohio Bell's total equipment inventory is not a part of this record.  Thus, again we are unable to apply the suggested analysis by Judge Taft to determine whether the value of that portion of the investment required to furnish Ohio Bell's part of the proposed service, and to be charged to Cleveland subscribers, is greater or less than 0.7 per cent of the total value of Ohio Bell's investment presently devoted to serving those subscribers.  Perhaps the reason for this omission is that, as stated in the text, Ohio Bell makes no complaint that the cost of the increased service is excessive or unreasonable.  If, indeed, that complaint is implicit in its contention that inadequacy of existing service has not been shown, the failure to include in the record essential data renders the court unable to test the reasonableness of that contention.

these factors, taken as a whole, do not support that finding here, the commission would be powerless to require extended-area service to be furnished to any peripheral suburban area over the objection of a company franchised in the dominant urban area. That result was certainly not intended by the General Assembly in enacting Sections 4905.22, 4905.26, 4905.381, Revised Code.

Moreover, in this case appears a stipulation from which, standing alone, the commission might reasonably have found criteria to measure inadequacy of service in both areas.[5]

-----

[5]The absence of clear and definite criteria on the part of all the parties herein for determining the need for additional telephone service is one of the most striking features of this case. It is often said that matters of this kind are within the expertise of the regulatory body. In the opinion of the writer, the record here demonstrates precious little expertise among the experts.

It is a paradox that in this age of highly sophisticated telephone equipment which is able to discover available circuits, complete even long-distance calls and record charges for service without the aid of the human brain or hand, the procedures for discovering the *needs* of subscribers to that equipment belong to the era of the divining rod.

As appellant's rate supervisor in charge of rate planning for extended-area service testified:

"Q. I think you said in answer to a question by Mr. Ballou that you used other things to determine extended area service other than the calling rate, is that correct? A. That is correct.

"Q. And what are these other things? A. Demands on the part of our subscribers that we learn of through business office complaints, contact with—

"Q. I just want to write this down, demands on the part of your—A. Assuming these are our exchanges you are talking about, of course.

"Q. Well, we are talking about the whole thing, the demands on the part of subscribers to do what? A. To—requesting something other than message toll service to call a particular place they are interested in.

"Q. What else? A. These demands are complaints to the Public Utilities Commission, of course.

"Q. What other things do you use to determine EAS? A. Based on information we receive, feelings that we accumulate in our contact with subscribers, we then look at this problem with respect to where the things are that they need to call, what they are. You will remember back when we were talking about, in my testimony about contiguous situations, we made the point, and I think everyone recognizes it, that an exchange boundary sometimes divides an area that—a school district, and a community keeps them from calling a community that they may have requirements to call on a day-to-day basis. I guess the best way to sum it up is that you accumulate

In response to a request for information by complainants and Western Reserve, Ohio Bell stipulated without reservation as to materiality or relevancy that (1) the calling indices between its exchanges of Trinity, Olmstead Falls, Berea, Strongsville, North Royalton, Brecksville, Bedford, Chagrin Falls, Gates Mills, Willoughby and Wickliffe on the one hand, and the Cleveland metropolitan area on the other at the time extended-area service was furnished to those areas, were approximately the same as the calling indices between Northfield and Cleveland as revealed in this record, and (2) the volume of calls between those exchanges and Cleveland now have the same relationship as the volume of calls between Northfield and Cleveland if extended-area service were instituted between them. Obviously, the stipulation itself establishes no criteria by which the need for extended-area service might be determined. Yet it is conclusive that the calling indices to be found in this record were sufficient, together with anticipated volumes, to actuate Ohio Bell in no less than 11 other instances to correct voluntarily what it must have concluded to be inadequate service, for it is unreasonable to assume that Ohio Bell furnished and charged for service which was not required. Having offered this stipulation without qualification by evidence indicating that the increased charges which must have been imposed against Cleveland subscribers were unacceptable, Ohio Bell cannot be heard to complain of insubstantial evidence here to support the commission's finding of a need for service to its Cleveland subscribers or of an absence of probable objection to increased costs reasonably related to the service to be rendered. If, indeed, there were objections from Cleveland subscribers to the institution of more costly service to the 11 designated exchange areas,

a total feeling both from knowledge of the calling rates, the amount of contact you have with customers and their feelings, together with your scrutiny of the particular area involved to determine whether or not extended area service would on a two-way basis be required.

"Q. And based upon these feelings that you get, this is when you either say yes or no to extended area service situation, is that correct? A. Heretofore, that's been our—that's what we would have done with respect to two-way, because of the fact that our most immediate problems are around the big metropolitan centers, we are trying to determine alternative methods of doing this. * * *"

it was the duty of Ohio Bell, as a public utility company subject to the regulatory powers of the state and enjoying a portion of its sovereignty and as a party to this proceeding, to have disclosed that fact. Having failed so to do, it may be presumed that there were no objections to service extended to those areas.

The second question is whether the commission erred to the prejudice of Ohio Bell in not receiving evidence proffered as to other peripheral areas which might be in need of extended-area service to and from Cleveland within the near future. We fail to understand the relevance of this evidence particularly since it was unaccompanied by specific data indicating substantial similarities to the situation between Cleveland and Northfield or by a concession that the present message toll service from those areas to Cleveland is inadequate.

The third question relates to the time allowed for installation of equipment and facilities for the service ordered. No evidence was received on this issue by the commission. Ohio Bell filed a motion for extension of time in connection with its motion for a rehearing of the entire proceedings, from the denial of which this appeal is taken. In view of the apparent disposition of the commission to fix a date for inaugurating the new service without receiving evidence to support its choice of that date and over the timely objections of appellant, the order on that question is reversed and the cause is remanded to the commission to proceed forthwith to consider evidence on this issue and make its finding pursuant thereto. The remainder of the findings and order are, however, affirmed.

> *Order affirmed in part and reversed in part.*

TAFT, C. J., ZIMMERMAN, MATTHIAS and O'NEILL, JJ., concur.
HERBERT and BROWN, JJ., dissent.

BROWN, J., dissenting. The majority opinion approves the commission's finding in this case that the Ohio Bell Telephone Company's service to its Cleveland subscribers is inadequate. This finding by the commission was based solely on its conclusion that the average Cleveland subscriber wants to call the suburban Northfield area once per year and must pay a toll charge in order to do so.

58

The evidence to which the majority points as justifying its finding of inadequate service by Bell consists of a calling index from Cleveland to Northfield. The number of annual calls to the Northfield area from the 17 exchanges in the Cleveland area roughly equals the number of Cleveland subscribers. The evidence shows that the metropolitan exchanges are not equally responsible for these calls. Some of these exchanges are responsible for few calls to Northfield. By far the largest number of calls come from contiguous exchanges with which Northfield residents have more numerous social and business ties or from the mid-town exchange, the Cleveland shopping and business center to which all suburbs are oriented. These calls can now be made for toll charges approximately equal in total amount to the amount which will be charged under two-way extended-area service. This is evidence of adequate rather than inadequate service. The effect of ordering two-way extended-area service will be to transfer the financial burden of this traffic from the persons now making toll calls to Cleveland subscribers generally.

A finding of inadequate service in a hearing under Section 4905.06, Revised Code, is a prerequisite of a commission order under Section 4905.381, Revised Code.

Since there is no evidence of inadequate service by Ohio Bell to its Cleveland subscribers, two-way toll-free extended-area service could not lawfully be ordered.

Two-way extended-area service for Northfield should not depend upon need of Cleveland subscribers to call Northfield, for such a need is fictional or at all events will always be substantially behind the need of the suburb.

Where two telephone companies are involved, one in the metropolitan area and another in the suburb, reasonable regulation would require that cost factors which are peculiar to and required by the needs of the suburb should be allocated to the company serving the suburb and recovered by it in the usual manner, while the expense related to benefits that inure to subscribers in the metropolitan area (if any) might be charged without complaint to the metropolitan subscribers.

The investment which will be required by Ohio Bell to provide for the needs of Northfield in this case will amount to

$631,379, while the investment required of Western Reserve will be only $321,402. The fiction of the average Cleveland subscriber need in this case and the foreseeable effect of this precedent in similar Cleveland suburban community cases will impose a cost of $5,000,000 upon the Cleveland subscribers who were so lacking in interest in these proceedings that none of them appeared or testified that service to Northfield was needed or that Cleveland customers generally were willing to pay for the service here ordered.*

That other jurisdictions handle the same problem on a more reasonable basis is indicated by the remarks in *Re Cazenovia Telephone Corp.*, 8 Public Utilities Reports 3d 41, where the following is found:

"Intercompany foreign exchange service * * * has been a troublesome problem of far more importance than the number of people affected by it.

"The independent telephone companies are anxious to protect their boundary lines. There are a very few of their customers in general located near the boundary line who desire service from a different exchange than the one they would normally be served from. If that exchange is located in the territory of another company, the problem can be solved in one of two ways: first, by changing the boundary line, which all companies are reluctant to do and which would mean large numbers of complaints and hearings and the expenditure of much time and energy by all concerned. The second alternative is the method of intercompany foreign exchange service now in general use under a tariff where a customer desiring the service can obtain it. This service is particularly designed to meet the desires of the customer so that he may have telephone service where his community of interest exists. * * *.

"* * * *

"The subscriber taking normal exchange service either

---

*Commission administrative order No. 160 contains the following: "Willingness of a substantial majority of the subscribers to pay appropriate rates is a basic and necessary condition to the institution of 'extended area service.' The demands of a few subscribers should not force the institution of a more costly telephone service contrary to the wishes of a majority of the subscribers."

must pay the rates fixed in the tariff or go without service. The customer taking intercompany foreign exchange service is not required to do so unless he desires it upon the ground that it is a matter of convenience or economy. If he takes service from the normal company, he can talk to everyone he can communicate with if he has intercompany foreign exchange service, possibly not quite as expeditiously and perhaps with higher costs; but the service from the foreign company is a special service and, like all other special services, should be fully compensatory so that it will not be a burden on the great bulk of customers who neither have nor desire such service. (See opinion of Chairman Maltbie in case 12326, 64 PUR NS at p. 71.)''

The order of the Public Utilities Commission of Ohio is unlawful and unreasonable.

HERBERT, J., concurs in the foregoing dissenting opinion.